**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

MIKE ALBERT, LTD.,     :  Case No. 1:21-cv-286
           :
    Plaintiff,    :  Judge Matthew W. McFarland
           :
   v.       :
           :
540 AUTO REPAIR, INC., et al.,  :
           :
    Defendants.   :

---

### ORDER AND OPINION

---

This matter is before the Court on Defendants' Motion for Leave to Amend their Answer to the Amended Complaint (Doc. 46), Defendant 540 Auto Repair Inc.'s Motion for Summary Judgment on the Amended Complaint (Doc. 51), Defendants Abdul and Zoila Abukatab's Motion for Summary Judgment on the Amended Complaint (Doc. 52), and Plaintiff Mike Albert, Ltd.'s Motion for Partial Summary Judgment (Doc. 55). Each motion has been fully briefed. (*See* Docs. 56, 57, 58, 59, 60, & 61.) Thus, these matters are ripe for review.

For the following reasons, Defendants' Motion for Leave to Amend their Answer to the Amended Complaint (Doc. 46) is **DENIED**, Defendant 540 Auto Repair Inc.'s Motion for Summary Judgment on the Amended Complaint (Doc. 51) is **GRANTED IN PART AND DENIED IN PART**, Defendants Abdul and Zoila Abukatab's Motion for Summary Judgment on the Amended Complaint (Doc. 52) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff Mike Albert, Ltd.'s Motion for Partial Summary

Judgment (Doc. 55) is **DENIED**.

## FACTS

This case centers on a tumultuous business relationship. What began as a routine agreement for the lease of taxicabs quickly turned into a matter of unpaid leases and missing vehicles.

### I. The Parties Involved

#### a. Plaintiff and Related Party

Mike Albert Leasing, Inc. is a vehicle fleet leasing company in Hamilton County, Ohio. (*See* Endres Dep., Doc. 49-1, Pg. ID 819-21; Miller Decl., Doc. 58-2, Pg. ID 2348.) Mike Albert Leasing, Inc. oversees Plaintiff Mike Albert, Ltd. ("MAL")—a statutory trust. (*See* Certificate of Trust, Doc. 58-3.) MAL holds title to all vehicles used by Mike Albert Leasing, Inc. in its business. (Miller Dec., Doc. 58-2, Pg. ID 2348.)

Pursuant to MAL's Certificate of Trust, Mike Albert Leasing, Inc. is the "true and lawful attorney-in-fact for and on behalf of [MAL], with full power and authority to perform any and all acts related to managing, servicing, administering and collecting any part of the corpus of MAL." (Certificate of Trust, Doc. 58-3, Pg. ID 2352-53.)

#### b. Defendants

Defendant 540 Auto Repair, Inc. ("540 Auto") is an Illinois corporation that primarily operates in Chicago. (Abukatab Dep., Doc. 50-1, Pg. ID 1373.) Originally established as an auto repair company, 540 Auto quickly expanded its operations to include selling vehicles and managing taxicabs. (*Id*. at Pg. ID 1380-82.)

Defendant Zoila Abukatab is 540 Auto's President and sole shareholder.

(Abukatab Dep., Doc. 50-1, Pg. ID 1419.) Defendant Abdul Abukatab is the operation manager of 540 Auto, where he engages in the day-to-day operations of the company. (*Id.* at Pg. ID 1370.) Along with their involvement with 540 Auto, Zoila and Abdul Abukatab ("Individual Defendants") own and manage several other taxicab companies. (*See* Abukatab Interrogs., Doc. 55-12.) These entities operate from the same location as 540 Auto. (Abukatab Dep., Doc. 50-1, Pg. ID 1410.)

## II.   The Lease Agreement

On June 11, 2018, MAL and 540 Auto entered into a "Commercial Motor Vehicle Master Lease Agreement (Open-End)" ("Lease Agreement"). (Lease Agreement, Doc. 7-1.) The Lease Agreement, governed by Ohio law, created a business relationship between MAL and 540 Auto. (*See id.* at Pg. ID 119.) MAL agreed to lease its vehicles to 540 Auto "for use in its business" by 540 Auto's drivers, agents, employees, and designees. (*Id.* at Pg. ID 106, 111.)

The Lease Agreement laid out the method for 540 Auto to lease a vehicle from MAL. First, 540 Auto could "request that [MAL] provide a written proposal," known as a Vehicle Quotation ("VQ"), "with respect to a proposed new [v]ehicle or group of [v]ehicles to be leased." (Lease Agreement, Doc. 7-1, Pg. ID 106.) The VQ would specify the make and model of the vehicle to be leased, the lease term, and financing of the vehicle. (*Id.*) 540 Auto could then "order [v]ehicles for lease" by submitting a "Vehicle Lease Order" ("VLO") to MAL. (*Id.*) The VLO incorporated the information set forth in the related VQ, and also specified the order date and requested delivery date. (*Id.* at Pg. ID 107.) Upon delivery of that vehicle, MAL provided 540 Auto with a "Schedule A" form

that identified the vehicle and set forth the monthly rental payment. (*Id.*) The VLO and related Schedule A were "deemed to be a separate lease agreement" with respect to that specific vehicle, though both documents were "deemed to fully incorporate by reference the terms of [the] [Lease] Agreement and the related VQ." (*Id.*)

When 540 Auto accepted delivery of a vehicle, it acknowledged that the vehicle was in "good repair," "satisfactory condition," and acceptable as received. (Lease Agreement, Doc. 7-1, Pg. ID 106.) Thereafter, 540 Auto was responsible for paying monthly rent, relevant financing, taxes, titling, and registration fees for that vehicle. (*Id.* at Pg. ID 108-10.)

540 Auto could elect to finance the "License Costs and/or Sales Tax" of a particular vehicle, so long as it received prior approval by MAL. (Lease Agreement, Doc. 7-1, Pg. ID 110.) MAL had the sole discretion to grant or withhold its approval. (*Id.*) If a lease was terminated before the anticipated lease end date, then 540 Auto had to pay the "Licensing Costs and/or Sales Tax" that was unpaid at the date of the termination. (*Id.*)

At the end of a vehicle's lease term, 540 Auto could either return the vehicle to MAL or notify MAL of its desire to buy the vehicle. (Lease Agreement, Doc. 7-1, Pg. ID 114-15.) 540 Auto had the right to buy leased vehicles, so long as it was not in default on any of its payments to MAL. (*Id.* at Pg. ID 115.)

The Lease Agreement provided several ways that a signed party could be in default. (Lease Agreement, Doc. 7-1, Pg. ID 114-16.) Relevant here, 540 Auto could be in default if it had been "in default of the payments required to be made by" it and "such default continued unremedied for a period of five (5) business days after written notice

4

of such failure." (*Id.* at Pg. ID 116.)

Once 540 Auto defaulted on any one of its leases, MAL had the right to "declare all sums owing . . . immediately due and payable." (Lease Agreement, Doc. 7-1 Pg. ID 116-17.) Following, 540 Auto remained responsible for the payment of the outstanding amount on its billing account, plus the total "book value" of the relevant vehicles. (*Id.* at Pg. ID 117.) That amount owed could be offset by MAL's repossession and subsequent sale of the leased vehicles. (*Id.* at Pg. ID 116-17.) Default did not terminate 540 Auto's obligations under the Lease Agreement. (*Id.*)

### III.   Subsequent Relationship

After the parties entered into the Lease Agreement, MAL began leasing vehicles to 540 Auto. (*See, e.g.*, Summary Chart of Documents by Vehicle, Doc. 53-10.) The parties followed the procedure laid out in the Lease Agreement—540 Auto would produce VQ and VLO documents and, in response, MAL delivered the requested vehicles and related Schedule A documents. (*Id.*; *See* VQs, Doc. 55-4; VLOs, Doc. 55-3.)

Mike Albert Leasing, Inc. maintains that it acted on behalf of MAL during the length of the Lease Agreement. (*See* Endres Dep., Doc. 49-1, Pg. ID 827.) To be sure, Mike Albert Leasing, Inc. performed all of the administrative functions relevant to the Lease Agreement, including communicating with 540 Auto, submitting relevant leasing documents, and delivering vehicles. (*Id.*) Further, 540 Auto's lease payments were submitted to a bank account owned by Mike Albert Leasing, Inc. (*Id.*)

Similarly, Abdul Abukatab maintains that he performed on behalf of 540 Auto. (*See* Abukatab Dep., Doc. 50-1, Pg. ID 1372.) As the operations manager, Abdul

corresponded with MAL through his "540autogroup" email account for matters relating to the Lease Agreement. (*See, e.g.*, Email Correspondence, Doc. 49-7.) Abdul also made payments on behalf of 540 Auto to MAL through 540 Auto's bank account. (Abukatab Aff., Doc. 52-2, Pg. ID 1696; Abukatab Dep., Doc. 50-1, Pg. ID 1432.)

As the relationship continued, 540 Auto extended two specific requests to MAL.

### a. 540 Auto's First Request

Sometime in June 2018, 540 Auto emailed MAL with its first request. (Auto Auction Email Correspondence, Doc. 49-10, Pg. ID 1125.) 540 Auto found three vehicles at an auction that it wanted MAL to buy and then lease out to 540 Auto. (*Id.*) MAL agreed to the arrangement and sent out a $33,580.00 check made to the order of 540 Auto's car dealer, Credit Master Auto Sales. (*Id.* at Pg. ID 1128; Auto Auction Check, Doc. 49-3, Pg. ID 1088.) Following, MAL created VQ and VLO paperwork for the vehicles, assigning them as Units 1009007, 1009008, and 1009009. (*See* Endres Dep., Doc. 49-1, Pg. ID 858-59; VQs and VLOs, Doc. 53-8.) But MAL's check arrived too late, and the three vehicles were sold to a different bidder. (*See* Abukatab Dep., Doc. 50-1, Pg. ID 1462-63.) What happened subsequently is disputed by the parties.

### i. MAL's Version of Events

MAL maintains that it never learned of the check's late arrival. (*See* Endres Dep., Doc. 49-1, Pg. ID 882-84.) Believing that the original vehicles had been purchased, MAL sent Schedule A documents containing information from the original auction vehicles to 540 Auto. (*Id.*) 540 Auto executed those documents, never making MAL aware of the discrepancy. (*Id.*) MAL maintains that, after the three vehicles were sold to a different

party, Defendants personally retained the $33,580.00 check. (*Id.*)

### ii. Defendants' Version of Events

In contrast, 540 Auto maintains that, after the three vehicles were sold to a third party, MAL and 540 Auto agreed that 540 Auto would find and purchase three replacement vehicles using the $33,580.00 check. (Abukatab Dep., Doc. 50-1, Pg. ID 1477.) Though 540 Auto found three replacements, MAL only processed and updated one of the three vehicles—Unit 1009007—in their system. (*Id.* at Pg. ID 1477-80.) Email correspondence supports this theory. (*See* Email Correspondence, Doc. 49-7.) 540 Auto maintains that it tried to send the titles for the new vehicles to Mike Albert Leasing, Inc., but Mike Albert Leasing, Inc. failed to process the paperwork. (Abukatab Dep., Doc. 50-1, Pg. ID 1478.)

Alternatively, Defendants also maintain that they never received the $33,580.00 check in the first place. (*See* Abukatab Aff., Doc. 51-2.) Defendants thus argue that they had no responsibility over the funds or the auction vehicles. (*Id.*)

### b. 540 Auto's Second Request

Sometime in October 2018, 540 Auto contacted MAL with its second request. (Email Correspondence, Doc. 49-18, Pg. ID 116-70.) 540 Auto communicated to MAL that it intended to use the vehicles it leased from MAL as taxicabs. (*Id.*) 540 Auto intended to then sublease those vehicles to other tax cab companies—many of which they also owned. (*See id*; Abukatab Interrogs., Doc. 55-12.) But, according to 540 Auto's understanding of Chicago taxicab regulations, only someone who owned a taxicab could lease it out to a third party. (*Id.*) Meaning, 540 Auto could not directly sublease MAL's vehicles to other

companies for taxi purposes. (*Id*.) 540 Auto hoped to work with MAL to devise a resolution to this issue. (*Id*.)

540 Auto and MAL worked together to find an answer. First, 540 Auto suggested that MAL create separate lease agreements for the vehicles to be signed directly by the third-party taxicab companies. (Email Correspondence, Doc. 49-18, Pg. ID 1171.) The parties quickly abandoned this idea. Instead, the parties decided that MAL would create "sub-accounts" for these third-party taxicab companies on 540 Auto's billing account. (*Id*. at Pg. ID 1170.) MAL would bill those sub-accounts directly for the vehicle lease payments. (*Id*.) Then, 540 Auto could "collect" those bills and pay them directly, on behalf of the separate cab companies. (Abukatab Dep., Doc. 50-1, Pg. ID 1440-44.)

As detailed in their creation letter, these sub-accounts were created "for billing purposes only." (*See* Sub-Accounts Letter, Doc. 50-7.) Signed by Zoila Abukatab, the letter notes that the sub-accounts were "set up as a billing convenience" for 540 Auto and that "the ultimate financial responsibility" of the sub-accounts remained with 540 Auto. (*Id*.) Following the creation of the sub-accounts, 540 Auto continued to be designated as the lessee on all of the vehicle leasing documents. (*See* VQs, Doc. 55-4; VLOs, Doc. 55-3.)

## IV. 540 Auto's Default

The parties continued on in their business relationship, though 540 Auto's accounts would continually be behind in payments. (*See* Notice of Default, Doc. 53-5, Pg. ID 1874.) By November 2019, 540 Auto's billing account was behind in payments by $47,366.07. (Notice of Default, Doc. 53-5, Pg. ID 1874.) Around this time, MAL notified 540 Auto that, based on the status of its account, it would not reimburse 540 Auto for the

$13,393.00 in taxes that 540 Auto had made direct payments on for certain vehicles. (Email Correspondence, Doc. 50-10, Pg. ID 1636.) And, on November 1, 2019, MAL issued a notice of default to 540 Auto. (Notice of Default, Doc. 53-5, Pg. ID 1874.)

MAL and 540 Auto worked together for several months in an attempt to get 540 Auto's billing account current. (*See* Email Correspondence, Doc. 49-15.) At one point, MAL offered to clear 540 Auto's debt if 540 Auto would buy all of the vehicles that it had leased from MAL. (*Id.*) In response, 540 Auto offered to buy two of the vehicles. (*Id.*) MAL found this counteroffer insufficient to make 540 Auto's account current. (*Id.*)

As no solution seemed apparent, MAL commenced its contractual remedies for default. MAL began repossessing the vehicles it had leased to 540 Auto. (*See, e.g.,* Repossession Email Correspondence, Docs. 49-19 & 49-15.) MAL then sold those vehicles at auction and credited the proceeds to 540 Auto's billing account. (*See* Credit Invoices, Doc. 55-6.)

MAL leased between 39 and 41 vehicles to 540 Auto over the course of their business relationship. (*See* Leased Vehicle Sheet, Doc. 50-8; Abukatab Dep., Doc. 50-1, Pg. ID 1421.) MAL recovered a majority of those vehicles, though five vehicles—Units 989302, 990504, 1009007, 1009008, and 1009009—remained unaccounted for. (*See* Leased Vehicle Sheet, Doc. 50-8; *see also* Chart, Doc. 7-3.) What became of those five vehicles is disputed by the parties.

### i. Units 989302 and 990504

First, 540 Auto sold two of the missing vehicles—Units 989302 and 990504—to third parties. (*See* Email Correspondence, Doc. 50-9, Pg. ID 1629; Abukatab Dep., Doc. 50-

1, Pg. ID 1467-68.) Abdul Abukatab maintains that 540 Auto sold one of those vehicles to an undisclosed third party for an undisclosed amount. (Abukatab Dep., Doc. 50-1, Pg. ID 1468.) He maintains that MAL accepted and retained the funds from that sale. (*Id.*) The other vehicle was sold to an individual in Wisconsin for $12,000.00. (*Id.* at Pg. ID 1474.) Abdul maintains that MAL refused to transfer title of the vehicle to that individual. (*Id.* at Pg. ID 1475.) Still, the individual kept the vehicle, so 540 Auto retained the proceeds from the sale. (*Id.*) The whereabouts of both vehicles are presently unknown. (*See id.*; *see also* Email Correspondence, Doc. 50-9, Pg. ID 1629.)

540 Auto maintains that it had the authority to sell these vehicles based on previous buyout conversations and the limited power-of-attorney given to 540 Auto. (Abukatab Dep., Doc. 50-1, Pg. ID 1466-73.) The power-of-attorney referenced by 540 Auto provided 540 Auto with the limited power to title, register, license, renew, and transfer licenses for MAL's vehicles. (Endres Dec., Doc. 55-2, Pg. ID 1997; Power of Attorney, Doc. 55-7, Pg. ID 2201.) 540 Auto was explicitly forbidden from selling or transferring ownership of MAL's vehicles. (Power of Attorney, Doc. 55-7, Pg. ID 2201.)

### ii. Units 1009007, 1008009, and 1009009

The remaining missing vehicles—Units 1009007, 1009008, and 1009009—are those that were not bought at the auction. (Email Correspondence, Doc. 49-15.) As detailed above, the parties agree that the original auction vehicles were never purchased. What happened subsequent is disputed. MAL maintains that it discovered that 540 Auto had not bought the three auction vehicles when it began the repossession process. (*See* Endres Dep., Doc. 49-1, Pg. ID 882-84.) In contrast, 540 Auto maintains that MAL was aware of

10

the incomplete auction sale and agreed to the subsequent purchase of replacement vehicles. (Abukatab Dep., Doc. 50-1, Pg. ID 1477-78.)

If replacement vehicles were purchased, it is unclear what happened to them following 540 Auto's default. Abdul Abukatab maintains that one of the replacement vehicles was totaled in an accident. (Abukatab Dep., Doc. 50-1, Pg. ID 1482.) Though, MAL did not receive the insurance proceeds from the alleged accident. (*Id.* at Pg. ID 1483.) Abdul maintains that a second replacement vehicle was repossessed by MAL. (Abukatab Dep., Doc. 50-1, Pg. ID 1483.) Email correspondence suggests that this may be true, though it also suggests that MAL did not have title to that vehicle. (Email Correspondence, Doc. 49-7.) The third replacement vehicle is unaccounted for.

Now, the parties are at an impasse. 540 Auto's billing account remains outstanding in an amount of at least $58,000.00. (*See* Billing Account Statement, Docs. 7-2 & 50-11.) 540 Auto maintains that it has been compliant throughout the default process, and that it owes nothing to MAL. (*See* Zoila Abukatab Aff., Doc. 50-2.)

**PROCEDURAL POSTURE**

MAL first brought this action against 540 Auto, Zoila Abukatab, and Abdul Abukatab in the Hamilton County Court of Common Pleas on March 18, 2021. (Notice of Removal, Doc. 1.) On April 21, 2021, Defendants removed the action to this Court. (*Id.*) That same day, 540 Auto filed an Answer and Counterclaims to MAL's original Complaint. (Answer and Counterclaims, Doc. 2.)

On May 12, 2021, MAL filed an Amended Complaint (Doc. 7) against all Defendants. 540 Auto filed a new Answer to the Amended Complaint (Doc. 15), while

Individual Defendants brought a Motion to Dismiss (*See* Doc. 14). The Court denied Individual Defendants' Motion to Dismiss (*See* Order and Opinion, Doc. 35), but Individual Defendants filed no responsive pleading after that Order.

Thereafter, a Calendar Order was set. (10/01/2021 Calendar Order.) Pursuant to that Order, the parties could move to amend their pleadings by November 30, 2021. (*See id.*) On September 9, 2022, all Defendants moved to file an amended answer. (Motion to Amend, Doc. 46.) And, at the beginning of October 2022, the parties filed separate Motions for Summary Judgment. (*See* Docs. 51, 52, & 55.)

## LAW & ANALYSIS

The Court will first consider Defendants' Motion to Amend before addressing the parties' Motions for Summary Judgment.

### I.  Defendants' Motion to Amend

Defendants move to amend 540 Auto's Answer to include Individual Defendants as respondents and add new defenses. (*See* Motion to Amend, Doc. 46.) Under Federal Rule of Civil Procedure 15(a)(2), if a party cannot amend its pleading as a matter of course under subsection (1), then "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Courts are authorized to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But, "once a pleading amendment deadline has passed as set forth in a court's scheduling order, a higher standard is required" to allow amendment. *Bowen v. Time Warner Entm't*, No. 5:10-cv-1301, 2011 U.S. Dist. LEXIS 6927, at *6 (N.D. Ohio Jan. 25, 2011) (citing Fed. R. Civ. P. 16(b)(4)). While Rule 15(a) provides that a court should freely give leave to amend, a request to amend

after an amendment deadline requires modification of the scheduling order. *Leary v. Daeschner*, 349 F.3d 888 (6th Cir. 2003). Federal Rule of Civil Procedure 16(b)(4) provides that a scheduling order may be modified "only for good cause and with the judge's consent."

Defendants move to amend 540 Auto's Answer almost a year after the amendment deadline. (*See* 10/01/2021 Calendar Order.) So, Defendants must first establish good cause for failing to amend by the deadline before the Court can consider whether the amendment is proper under Rule 15(a). *Leary*, 349 F.3d at 909. "Good cause is measured by the movant's diligence in attempting to meet the case management order's requirements." *Id.* at 906-07 (quotation omitted). Although prejudice to the opposing party is not expressed as a factor in Rule 16(b)(4), "it is nonetheless a relevant consideration" in a court's "good cause" analysis. *Id.*

Defendants have failed to show good cause for their failure to timely amend their Answer. To justify their delay, Defendants maintain that they only recently became aware that MAL is a statutory trust and that they must amend their Answer accordingly. (Motion to Amend, Doc. 46, Pg. ID 765-66.) Of course, MAL's Amended Complaint—which was filed on May 12, 2021—states that MAL is a statutory trust. (Am. Compl., Doc. 7, ¶ 1.) Defendants offer no other sufficient reason for failing to timely amend 540 Auto's Answer. Thus, Defendants have not demonstrated good cause to warrant their requested amendment.

The Court must now consider the consequences of Individual Defendants' failure to answer MAL's Amended Complaint. Ordinarily, "[a] defendant must serve an answer

13

. . . within 21 days after being served with the summons and complaint." Fed. R. Civ. P. 12(a)(1)(A). That time is extended when a motion to dismiss is filed, but once the motion is denied, a defendant has 14 days to file an answer. Fed. R. Civ. P. 12(a)(4)(A). If a defendant fails to file an answer as required, the allegations in the complaint, "other than one[s] relating to the amount of damages," are deemed admitted. Fed. R. Civ. P. 8(b)(6). The failure to file an answer does not mean that a defendant admits legal conclusions. *See Thompson v. DeWine*, 976 F.3d 610, 616 n.5 (6th Cir. 2020).

That said, the Sixth Circuit has found that "the failure to file an answer may be harmless, most usually where the plaintiff is consistently on notice that the defendant is disputing the facts." *Jones v. Pekoske*, No. 21-1061, 2021 U.S. App. LEXIS 36223, at *6 (6th Cir. Dec. 7, 2021). In *Jones*, the district court granted the defendant's original motion to dismiss. *Id.* On appeal, the Sixth Circuit affirmed the district court's decision, excluding one claim. *Id.* at *7. On remand, litigation proceeded on that claim, though the defendant failed to answer the original complaint. *Id.* Still, the Sixth Circuit found that the plaintiff was on notice of the contested facts based on the discovery process and the defendant's motions for summary judgment. *Id.* The plaintiff "knew what was in dispute, and she faced no 'unfair surprise.'" *Id.* (citation omitted). Having found no harm to the plaintiff, the court proceeded as though the defendant had properly answered and denied the factual allegations in the plaintiff's complaint. *See id.*

Here, Individual Defendants have constructively denied the facts in MAL's Amended Complaint. First, the parties engaged in discovery which "focused entirely on proving or disproving those allegations" in the Amended Complaint. *Jones*, 2021 U.S.

14

App. LEXIS 336223, at *7. Next, Individual Defendants filed their own Motion for Summary Judgment (Doc. 52), where they further deny the allegations made against them. Indeed, MAL does not allege harm or make the argument that Individual Defendants have admitted to the allegations in the Amended Complaint. (*See* MAL's Motion for Summary Judgment, Doc. 55; MAL's Responses in Opposition to Individual Defendants, Doc. 58.) Instead, MAL assumes that Individual Defendants, like 540 Auto, have properly denied the allegations in MAL's Amended Complaint. (*See id.*) Having found no harm to MAL, the Court will proceed as though Individual Defendants have properly denied the factual allegations in MAL's Amended Complaint.

## II.    Motions for Summary Judgment

The Court now turns to the parties' Motions for Summary Judgment. (Docs. 51, 52, & 55.) When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court need not search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the

15

nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

MAL brings (1) a breach of contract claim against 540 Auto, (2) an action on account claim against 540 Auto, (3) an unjust enrichment claim against all Defendants, (4) a conversion claim against all Defendants, (5) a fraudulent inducement claim against all Defendants, and (6) an alter ego claim against Individual Defendants. (Am. Compl., Doc. 7, ¶¶ 23-48.) 540 Auto brings claims against MAL for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) declaratory judgment. (Answer and Counterclaim, Doc. 2, ¶¶ 18-29.)

540 Auto and Individual Defendants move for summary judgment on all the claims against them. (*See* 540 Auto Motion for Summary Judgment, Doc. 51; Individual Defendants' Motion for Summary Judgment, Doc. 52.) MAL moves for partial summary judgment on the claims that it has brought against Defendants and total summary judgment on 540 Auto's claims against it. (MAL's Motion for Summary Judgment, Doc. 55.) For clarity, the Court will proceed through each claim individually and address all of the parties' arguments together.

### a. MAL's Breach of Contract Claim Against 540 Auto

First, the Court will consider MAL's breach of contract claim against 540 Auto. (*See* Am. Compl., Doc. 7, ¶¶ 23-26.) Both 540 Auto and MAL move for summary judgment on

16

this claim. (540 Auto Motion for Summary Judgment, Doc. 51; MAL's Motion for Summary Judgment, Doc. 55.) MAL argues that summary judgment should be resolved in its favor because it has shown that 540 Auto breached the Lease Agreement. (*See* MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1977-78.) 540 Auto argues that summary judgment should be granted in its favor because MAL lacks standing to bring the claim. (*See* 540 Auto Motion for Summary Judgment, Doc. 51, Pg. ID 1654-58.)

### i. Standing

The Court will first consider 540 Auto's standing argument. 540 Auto argues that MAL lacks standing to sue under the Lease Agreement because Mike Albert Leasing, Inc.—rather than MAL—was the entity that performed under the Lease Agreement. (540 Auto Motion for Summary Judgment, Doc. 51, Pg. ID 1654.) In response, MAL argues that 540 Auto has waived standing as an affirmative defense. (MAL's Response in Opp. to 540 Auto, Doc. 57, Pg. ID 2275-80.) Alternatively, MAL argues that it has standing to sue as a signing party to the Lease Agreement. (*Id.*)

"Standing is an integral part of the threshold requirement of Article III of the Constitution that those who seek to invoke the power of the federal courts must allege an actual case or controversy." *Katter v. Ohio Empl. Rels. Vd.*, 492 F. Supp. 2d 851, 856 (S.D. Ohio 2007) (citation omitted). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

When a state law claim is brought in federal court, the plaintiff must meet both Article III and state standing requirements. *See Aarti Hosp., LLC v. City of Grove City, Ohio*, 350 F. App'x 1, 6 (6th Cir. 2009). In Ohio, "an action for breach of contract can only be maintained by the parties to the contract or those deriving rights from the contracting parties." *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.*, 608 N.E.2d 830, 833 (Ohio Ct. App. 1992).

MAL first argues that 540 Auto waived standing because 540 Auto did not bring standing as an affirmative defense in its Answer. (MAL's Response in Opp. to 540 Auto, Doc. 57, Pg. ID 2275-80.) But standing cannot be waived. *See Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996) (holding that standing is not subject to waiver); *see also Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) ("[S]tanding is not an affirmative defense that must be raised at risk of forfeiture."). So, this argument is not well taken.

Though 540 Auto can raise standing, it has not shown that MAL lacks standing to sue for its breach of contract claim. MAL is the contracting party to the Lease Agreement and holds title to all vehicles leased to 540 Auto. (Endres Dep., Doc. 49-1, Pg. ID 821.) The Lease Agreement gave 540 Auto the right to lease MAL's vehicles for a specified term. (Lease Agreement, Doc. 7-1.) In return, 540 Auto had to make lease payments to MAL for use of its vehicles. (*See id.*) MAL maintains that 540 Auto breached the Lease Agreement by failing to make those lease payments. (Am. Compl., Doc. 7, ¶¶ 23-26.) As a result of the breach caused by those missed payments, MAL has suffered damages. MAL has standing, then, as it sustained a compensable injury from 540 Auto's breach that the Court

18

can redress. *See Derby v. Westminster Found.*, 103 N.E.2d 10, 12 (Ohio Ct. App. Feb. 19, 1951) ("A breach of contract always creates a right of action.")

Mike Albert Leasing, Inc.'s performance on behalf of MAL under the Lease Agreement does not destroy MAL's standing. "Absent a clause making delegation ineffective, a party may generally delegate his or her duties under a contract." *Kuhens v. Weaver*, No. 643, 1996 Ohio App. LEXIS 1446, at *11 (Ohio Ct. App. Apr. 5, 1996) (citations omitted.) There is no provision in the Lease Agreement that restricts the delegation of duties by either party. Thus, MAL could properly delegate its obligations under the Lease Agreement to Mike Albert Leasing, Inc. and still retain standing.

Similarly, the fact that 540 Auto's lease payments were submitted to Mike Albert Leasing, Inc.'s bank account does not diminish MAL's injury. 540 Auto does not point to any caselaw to show that a contracting party must use the proceeds obtained from a contract in a particular way to maintain standing. To be sure, MAL is a party to the Lease Agreement. And, "a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991).

MAL is therefore a real party in interest and has standing to sue 540 Auto for its alleged breach of the Lease Agreement.

### ii. Substance of Claim

Having determined that MAL has standing on its breach of contract claim, the Court will now turn to the substance of the claim.

The Lease Agreement is governed by Ohio law. (Lease Agreement, Doc. 7-1, Pg.

19

ID 119.) To prove a breach of contract under Ohio law, a plaintiff must prove four elements: (1) that a contract existed, (2) the plaintiff performed, (3) the defendant breached, and (4) the plaintiff suffered damages as a result of the breach. *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006).

MAL maintains that 540 Auto breached the Lease Agreement by failing to make payments on the amount it owed for the lease of MAL's vehicles. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1977-78.) This breach is evidenced by the outstanding balance on 540 Auto's billing account, which exceeds $58,000.00. (Billing Account Statements, Doc. 7-2 & 50-11.) As a result of 540 Auto's breach, MAL maintains that it suffered damages in an amount to be determined at trial. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1977-78.)

540 Auto brings several arguments to contest this showing. 540 Auto argues that (1) the Lease Agreement was abandoned by the parties, (2) it is not responsible for the lease payments, and (3) MAL materially breached the Lease Agreement first, thereby waiving 540 Auto's obligation to make payments. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2242-47.) While 540 Auto's first two arguments are baseless, 540 Auto's third argument deserves some attention.

### 1. Abandonment

540 Auto first argues that the parties abandoned the Lease Agreement when 540 Auto began to sublease MAL's vehicles to third-party taxicab companies. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2242-45.)

"Parties who have entered into a contract may, by mutual consent or conduct,

abandon the contract which they have entered into." *Hunter v. BPS Guard Servs., Inc.*, 654 N.E. 2d 405, 411 (Ohio Ct. App. 1995). "[A] contract will be treated as abandoned when the acts of one party, which are inconsistent with the existence of the contract, are acquiesced in by the other party." *Id*. Thus, "mutual abandonment of a contract need not be expressed, but can be inferred from the conduct of the parties and the surrounding circumstances." *Id*. When one party abandons the contract, the other party can consent to the abandonment and the contract is then dissolved. *Id*. at 541. When this happens, "the parties are restored to their original position and neither party may sue for breach of the contract, nor compel specific performance." *Id*.

The parties did not abandon the Lease Agreement when 540 Auto subleased MAL's vehicles. The Lease Agreement explicitly permits 540 Auto's "designees" to use MAL's vehicles. (Lease Agreement, Doc. 7-1, Pg. ID 111.) MAL understood the third-party taxicab companies to be "designees," and that the creation of their sub-accounts was merely a way to comply with local regulations. (*See* Endres Dep., Doc. 49-1, Pg. ID 998-99.) While, at one point, 540 Auto suggested that separate lease agreements be created for the subleases, this idea never came to fruition and was quickly abandoned by the parties. (*See* Email Correspondence, Doc. 49-18, Pg. ID 1171.) MAL always understood that 540 Auto was ultimately responsible for MAL's leased vehicles. (*See id.*) This understanding is evidenced by testimony, the designation of 540 Auto as the lessee on all of the leasing documents, and the sub-account creation letter which explicitly states that the accounts were "a billing convenience" and that "the ultimate financial responsibility" remained with 540 Auto. (*Id.*; Endres Dep., Doc. 49-1, Pg. ID 998-99; VQs, Doc. 55-4; VLOs,

Doc. 55-3; Sub-Accounts Letter, Doc. 50-7.)

Thus, 540 Auto has not shown that the parties mutually assented to the abandonment of the Lease Agreement.

### 2. Lease Payment Obligations

540 Auto next argues that the third-party taxicab companies—not 540 Auto—were responsible for making timely payments on the vehicle leases. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2245-46.) But as shown by the sub-account creation letter, 540 Auto assumed the "ultimate financial responsibility" for the lease of MAL's vehicles to the third-party taxicab companies. (*See* Sub-Accounts Letter, Doc. 50-7.) 540 Auto understood this obligation—as shown by Zoila Abukatab's acknowledgment signature on the creation letter and 540 Auto's practice of directly making payments on those sub-accounts. (*Id.*; Abukatab Dep., Doc. 50-1, Pg. ID 1440-44.) Thus, 540 Auto was responsible for the ultimate payments for the leased vehicles.

### 3. MAL Breached First

Lastly, 540 Auto argues that MAL first breached the Lease Agreement in several ways, thus negating any later breach by 540 Auto. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2246-47.)

A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party. *Software Clearing House v. Intrak, Inc.*, 583 N.E.2d 1056, 1060 (Ohio Ct. App. 1990). A breach is material if performance or nonperformance of the disputed term is essential to the purpose of the agreement. *Id*. To determine whether a breach of a contract is material, a

22

court considers the following:

> The extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*Id.*

But "not all breaches are created equal." *H&H Glass, Inc. v. Empire Bldg. Co., LLC,* No. C-150059, 2016 Ohio App. LEXIS 1894, at *5 (Ohio Ct. App. 2016). "A failure to perform a promise that is nominal, trifling, technical, or slight does not excuse performance under the contract by the nonbreaching party." *Id.* "[A] breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement." *Id.* (quotation omitted).

540 Auto brings forward various acts by MAL that it alleges were material breaches. (*See* 540 Auto's Response in Opp., Doc. 56.) While most of these alleged acts do not amount to a material breach, one might.

### a. Acts that do not constitute a breach

Several of MAL's alleged acts do not amount a breach of the Lease Agreement. 540 Auto first argues that MAL breached the agreement when it treated a missed payment on one vehicle lease as a default on the entire amount owed. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2246.) The Lease Agreement, however, states that if 540 Auto were to default on any one of its leases, MAL had the right to "declare all sums owing . . .

23

immediately due and payable." (Lease Agreement, Doc. 7-1 Pg. ID 116-17.) Second, 540

Auto argues that MAL breached the agreement by delivering "non-conforming" vehicles.

(540 Auto's Response in Opp., Doc. 56, Pg. ID 2247.) But the agreement explicitly states

that when 540 Auto accepted delivery of a vehicle, it constituted acceptance that the

vehicle was in "good repair," "satisfactory condition," and acceptable as received. (Lease

Agreement, Doc. 7-1, Pg. ID 106.) Third, 540 Auto argues that MAL breached the

agreement when it delivered vehicles to the wrong location. (540 Auto's Response in

Opp., Doc. 56, Pg. ID 2247.) But 540 Auto has provided no evidence that this occurred.

Thus, none of these acts by MAL constitutes a breach of the Lease Agreement.

### b. Act that may be a breach, but not material

One of MAL's alleged acts may have constituted a breach of the Lease Agreement,

but not a material one. 540 Auto argues that MAL breached the agreement when it

refused to pay for vehicle taxes. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2247.) The

Lease Agreement states that 540 Auto had the option to finance vehicle taxes through the

vehicle's lease with prior approval by MAL. (Lease Agreement, Doc. 7-1, Pg. ID 110.) If a

lease were terminated before its anticipated end date, then 540 Auto had to pay for those

taxes that were unpaid on the date of termination. (*Id.*)

With this provision in mind, MAL may have breached the Lease Agreement when

it refused to pay for some vehicle taxes. Sometime in November 2019, 540 Auto requested

that MAL refund it for $13,393.00 in vehicle taxes that 540 Auto paid directly. (Email

Correspondence, Doc. 50-10, Pg. ID 1636.) MAL declined to pay. (*Id.*) This

correspondence suggests that, at some point, 540 Auto and MAL may have agreed to

24

finance the vehicle taxes as prescribed by the Lease Agreement's tax financing provision. But it is unclear if MAL stopped financing those vehicles' taxes prior or subsequent to the termination of the lease. If MAL refused to finance taxes that it had agreed to finance before the termination of the lease, then MAL may have breached the Lease Agreement. Based on the limited evidence provided to the Court, it is unclear whether these taxes were financed and, if they were, if MAL's actions violated the Lease Agreement. Thus, whether this action is a breach is a question of fact.

But even if MAL breached the Lease Agreement by failing to pay 540 Auto's vehicle taxes, it is not enough to excuse 540 Auto's performance. *See H&H Glass, Inc.*, 2016 Ohio App. LEXIS 1894, at *5. The central purpose of the Lease Agreement is the lease of vehicles—not the extra costs that 540 Auto may later finance. A breach of this kind constitutes the sort of "nominal, trifling, technical, or slight" breach that would not excuse 540 Auto's performance. *Id*. Thus, MAL's potential breach for failing to pay vehicle taxes does not excuse 540 Auto from making payments on the amount it owed for the vehicle leases.

### c. Act that may be a material breach

One act by MAL may constitute a material breach of the Lease Agreement. 540 Auto argues that MAL breached the Lease Agreement when MAL ordered payments on vehicles that were never delivered. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2254.) The only evidence provided to show that this may have occurred relates to the auction vehicles—Units 1009007, 1009008, and 1009009. The parties agree that the original auction vehicles were not bought. (Abukatab Dep., Doc. 50-1, Pg. ID 1462-63; Endres Dep., Doc.

49-1, Pg. ID 882-84.) The parties dispute what happened subsequently: either replacement vehicles were purchased under those unit numbers or they were not. (*See id.*) In any event, the lease of those three vehicles was charged to 540 Auto's billing account. (*See* Billing Account Statements Doc. 7-2 & 50-11.) If replacement vehicles were never purchased, then 540 Auto was being charged for non-existent vehicles that it was not actually leasing. Consequentially, MAL may have materially breached the Lease Agreement when it charged MAL for the lease of Units 1009007, 1009008, and 1009009—disposing of 540 Auto's obligations.

\* \* \*

In sum, MAL may have a claim for breach of contract against 540 Auto for 540 Auto's failure to make payments on the leased vehicles. That said, 540 Auto's obligation to pay may have been waived if MAL charged 540 Auto for vehicles that were not actually leased. Whether MAL materially breached the Lease Agreement when it charged MAL for the lease of Units 1009007, 1009008, and 1009009 is a question of fact for the jury to decide. Thus, summary judgment on MAL's breach of contract claim is not appropriate.

### b. MAL's Action on Account Claim Against 540 Auto

MAL's next claim against 540 Auto is an "action on account" claim. (Am. Compl. Doc. 7, ¶¶ 27-28.) 540 Auto moves for summary judgment in its favor on this claim, arguing that MAL lacks standing. (540 Auto's Motion for Summary Judgment, Doc. 51, Pg. ID 1654-58.)

An action on account claim "simplifies pleadings by allowing a party to advance, as one claim, claims for separate breaches of contract based on a series of transactions."

*Kwikcolor Sand v. Fairmount Minerals Ltd.*, No. 96717, 2011 Ohio App. LEXIS 5466, at *10 (Ohio Ct. App. Dec. 22, 2011) (citation omitted.) In essence, then, an action on account claim is one for breach of contract. *Id.*

As detailed above, MAL has standing to bring its breach of contract claim against 540 Auto. MAL is a contracting party to the Lease Agreement and, because of 540 Auto's alleged breach, has suffered an injury which the Court can remedy. *See Sabino v. Liberty Health Care Ctr.*, No. 2018-T-0059, 2019 Ohio App. LEXIS 1391, at *8 (Ohio Ct. App. Apr. 8, 2019) (An action on an account may be maintained by one party against the other if there is "a contractual relationship between the two parties."). Thus, 540 Auto's argument is not well taken and summary judgment is denied on this claim.

### c. MAL's Unjust Enrichment Claim Against All Defendants

Next, MAL brings a claim for unjust enrichment against all Defendants. (Am. Compl., Doc. 7, ¶¶ 29-31.) All parties move for summary judgment on this claim. (*See* Motions for Summary Judgment, Docs. 51, 52, & 55.) MAL argues that summary judgment should be granted in its favor, relating the claim to the check submitted to 540 Auto for the purchase of auction vehicles. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1978-79.) Defendants argue that summary judgment should be granted in their favor because MAL lacks standing for this claim. (540 Auto's Motion for Summary Judgment, Doc. 51, Pg. ID 1654-1658; Individual Defendants' Motion for Summary Judgment, Doc. 52, Pg. ID 1679.) The Court need only consider Defendants' argument.

"A successful claim of unjust enrichment requires: (1) a benefit has been conferred by a plaintiff upon a defendant; (2) the defendant had knowledge of the benefit; and (3)

the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Chef Italiano v. Crucible Dev. Corp.*, No. 22415, 2005 Ohio App. LEXIS 3875, at *16 (Ohio Ct. App. Aug. 17, 2005). Unjust enrichment occurs when a person "has and retains money or benefits which in justice and equity belong to another." *Hummel v. Hummel*, 14 N.E.2d 923, 927 (Ohio 1938). "When there is an express contract related to the same subject matter, a claim for unjust enrichment cannot be sustained." *Wochna v. Mancino*, No. 07CA0059-M, 2008 Ohio App. LEXIS 868 at *15 (Ohio Ct. App. Mar. 10, 2008) (citation omitted).

MAL argues that Defendants were unjustly enriched when they received a $33,580.00 check from MAL for auction vehicles that were never purchased. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1979.) But MAL was not the entity that provided Defendants with $33,580.00. Rather, it was Mike Albert Leasing, Inc. that provided the funds for the auction vehicles. (Auto Auction Check, Doc. 49-3, Pg. ID 1088.) MAL has not shown that these funds were sourced from MAL in any way. As it was Mike Albert Leasing, Inc. who provided the alleged benefit, it is Mike Albert Leasing, Inc. that would be the proper party to bring this claim. MAL suffered no injury related to this event, as it was not MAL's capital. Thus, MAL lacks standing to bring suit on this claim. In turn, summary judgment for Defendants on this claim is appropriate.

### d. Conversion Claim Against All Defendants

Next, MAL brings a conversion claim against all Defendants. (Am. Compl., Doc. 7, ¶¶ 32-35.) MAL moves for summary judgment in its favor on this claim, arguing that it has sufficiently shown that Defendants converted Units 989302 and 990504 when they

improperly sold them. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1979.) Defendants also move for summary judgment on this claim, arguing that MAL lacks standing or, alternatively, that this tort claim is merely a "reclassification" of the breach of contract claim. (540 Auto's Motion for Summary Judgment, Doc. 51, Pg. ID 1652-60; Individual Defendants' Motion for Summary Judgment, Doc. 52, Pg. ID 1680-84.)

Conversion is the "wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Warnecke v. Chane*, 956 N.E.2d 908, 912 (Ohio Ct. App. 2011) (quotations omitted). "To be entitled to bring a claim for conversion, the plaintiff must have had an ownership interest and the right to possession of the property at the time of the alleged conversion." *Townsend v. Williger*, No. 5:05-cv-2540, 2006 U.S. Dist. LEXIS 99980, at *17 (N.D. Ohio Mar. 16, 2006) (citing *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1994) (applying Ohio law); *see also Pine v. Pine*, No. 01-cv-46, 2002 Ohio App. LEXIS 5268, at *11 (Ohio Ct. App. Sept. 26, 2002) ("In order to have standing to sue for conversion, the plaintiff must enjoy an interest in the personal property allegedly converted.")

Defendants do not contest MAL's ownership interest in the vehicles. Rather, they maintain that MAL gave Defendants the power-of-attorney to sell the vehicles on behalf of MAL. (Abukatab Dep, Doc. 50-1, Pg. ID 1466-73.) Yet the power-of-attorney was limited such that Defendants were only authorized to title and license the vehicles as the lessee. (Power of Attorney, Doc. 55-7, Pg. ID 2201.) Defendants were expressly prohibited from selling or transferring ownership of the vehicles. (*Id.*)

Proceeding under the incorrect assumption that they had the power to sell the leased vehicles, Defendants sold Units 989302 and 990504 to third parties. (*See* Email Correspondence, Doc. 50-9, Pg. ID 1629; Abukatab Dep., Doc. 50-1, Pg. ID 1467-68.) Abdul Abukatab maintains that MAL accepted and retained the funds from one of those sales and refused to process the sale of the second. (*See* Abukatab Dep., Doc. 50-1, Pg. ID 1468-74.) In any event, Defendants sold Units 989302 and 990504 without holding title or otherwise possessing the authority to sell those vehicles on behalf of MAL. Though they believed otherwise, Defendants were not authorized to sell Units 989302 and 990504. Thus, MAL has shown that Defendants may have converted Units 989302 and 990504. *See Dice v. White Fam. Cos.*, 878 N.E.2d 1105, 1111 (Ohio Ct. App. 2007) (citation omitted) ("It is not necessary to demonstrate intent or wrongful purpose by the defendant. Mistake or good faith is not a defense to conversion.").

Still, Defendants maintain that these sales were mere violations of the Lease Agreement and should be treated as a breach rather than a distinct tort. (*See, e.g,* Individual Defendants' Motion for Summary Judgment, Doc. 52, Pg. ID 1680-84.) Ohio courts have often viewed actions for breach of contract and conversion as alternative causes of action. *Gates v. Praul*, No. 10AP-784, 2011 Ohio App. LEXIS 5107, at *26 (Ohio Ct. App. Dec. 6, 2011). This principle is based on the general rule that "the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim." *Wolfe v. Cont'l Cas.* 647 F.2d 705, 7100 (6th Cir. 1981) (applying Ohio law).

To be sure, if MAL's breach of contract claim does not succeed, then MAL could proceed on its conversion claim. But even if 540 Auto is found to be liable for breach of

30

contract, the conversion claim may still be viable.

A tort claim that relates to a breach of contract can proceed where "the facts of the case show an intentional tort committed independently." *Ineos USA LLC v. Furmanite Am., Inc.*, No. 1-14-06, 2014 Ohio App. LEXIS 4868, at *14 (Ohio Ct. App. Nov. 10, 2014). To show that an intentional tort has been committed independently, the party must show a breach of an independent duty, as well as damages that are separate and distinct from the breach of contract. *See id.*

Here, it is unclear whether there is a distinct duty and damages separating MAL's conversion claim from its breach of contract claim. The Lease Agreement provides 540 Auto with the right to buy leased vehicles at the end of the lease, so long as it is not in default. (Lease Agreement, Doc. 7-1, Pg. ID 114-15.) Whether this provision can be said to extend to the improper sale of a leased vehicle is unclear, and has not been briefed by the parties. Additionally, MAL has not identified what damages it seeks to recover for this claim or explained how they differ from the damages requested from its breach of contract claim. Thus, there is a genuine issue of material fact as to whether this conversion claim is separate and distinct from MAL's breach of contract claim. *See Ineos*, 2014 Ohio App. LEXIS 4868, at *14 (precluding summary judgment when it was unclear whether tort claim was separate and distinct from breach of contract claim).

In turn, summary judgment on MAL's conversion claim is improper, in part because it is unclear whether this claim is distinct from MAL's breach of contract claim.

### e. Fraudulent Inducement Claim Against All Defendants

Next, the Court will consider Plaintiff's fraudulent inducement claim against all

Defendants. (*See* Am. Compl., Doc. 7, ¶¶ 36-43.) Again, all of the parties move for summary judgment on this claim. (Motions for Summary Judgment, Docs. 51, 52, & 55.) MAL maintains that summary judgment should be granted in its favor, linking the claim to Defendants' representations made in relation to the auction vehicles. (*See* MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1980.) Defendants also move for summary judgment, arguing that MAL lacks standing or, alternatively, that they were not involved in the transaction. (540 Auto's Motion for Summary Judgment, Doc. 51, Pg. ID 1652-54; Individual Defendants' Motion for Summary Judgment, Doc. 52, Pg. ID 1683.) Again, the Court need only consider Defendants' standing argument to determine the viability of this claim.

To prevail on a fraudulent inducement claim, a plaintiff must establish: (1) a false representation concerning a fact, (2) knowledge of the falsity of the representation or utter disregard for its truthfulness, (3) intent to induce reliance on the representation, (4) justifiable reliance on that representation, and (5) injury proximately caused by that reliance. *Ownerland Realty, Inc. v. Zhang*, No. CA2013-09-077, 2014 Ohio App. LEXIS 2542, at *10 (Ohio Ct. App. June 14, 2014). The elements of fraudulent inducement are substantially similar as those of fraud. *Huegel v. Scott*, No. 2015-T-0014, 2015 Ohio App. LEXIS 3514, at *6 (Ohio Ct. App. Aug. 31, 2015). And, "[u]nder Ohio law, a claim in fraud cannot be predicated upon statements or representations made to a third party; i.e., the communication must have been directly with the person who has brought the action." *McWreath v. Cortland Bank*, No. 2010-T-0023, 2012 Ohio App. LEXIS 2662, at *28 (Ohio Ct. App. June 29, 2012) (citation omitted).

MAL lacks standing to bring a fraudulent inducement claim for the statements made in relation to the auction vehicles. Statements relating to the auction vehicles were made by Abdul Abukatab to a representative of Mike Albert Leasing, Inc. (*See* Auto Auction Email Correspondence, Doc. 49-10, Pg. ID 1125.) No evidence has been presented to show that MAL learned of these statements or that it relied on these statements to its detriment. And MAL has presented no authority to show that a trust can bring a fraud claim for deceptive statements made to those who manage the trust. Thus, MAL lacks standing to assert a fraudulent inducement claim against Defendants and summary judgment must be entered in favor of Defendants on that claim.

### f. Alter Ego Claim Against Defendants Zoila and Abdul Abukatab

Finally, MAL claims that Individual Defendants are the "alter ego" of 540 Auto. (Am. Compl., Doc. 7, ¶¶ 44-48.) Individual Defendants move for summary judgment on this claim, arguing that alter ego is not an independent cause of action and, even if it were, there is insufficient evidence to warrant a piercing of the corporate veil. (Individual Defendants' Motion for Summary Judgment, Doc. 52, Pg. ID 1678-84.)

Before the Court can consider the substance of MAL's claim, some term clarification is necessary. Both parties use the phrases "alter ego" and "piercing the corporate veil" interchangeably in their briefing. (*See* Motions for Summary Judgment, Docs. 51, 52, & 55.) While the Sixth Circuit has found that "veil piercing and alter ego concepts are separate and distinct," *Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005), Ohio courts conflate the two concepts as one. *See, e.g.*, *Gershuny v. Gershuny*, No. C-140482, 2015 Ohio App. LEXIS 4357, at *7 (Ohio Ct. App. Oct. 28, 2015) ("the alter-

ego doctrine, also known as 'piercing the corporate veil'"); *see also United States Bank Nat'l Assn. v. MMCO, L.L.C.*, 183 N.E.3d 499, 516 (Ohio Ct. App. 2021) (addressing the importance of treating the two concepts as one). As the Court is applying Ohio law in its review of the alter ego claim, *see Est. of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008), the Court will likewise treat the concepts as one.

Individual Defendants first argue that MAL may not proceed on its alter ego claim because Ohio courts do not permit standalone claims of alter ego. To be sure, piercing the corporate veil or alter ego liability is a remedy, not an independent cause of action. *Graha v. City of Lakewood*, 113 N.E.3d 44, 58 (Ohio Ct. App. May 10, 2018); *see also Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (Alter ego and piercing the corporate veil are a "means of imposing liability on an underlying cause of action."). Because MAL has improperly pled alter ego as a wholly separate cause of action, this claim may be dismissed for this reason alone. But even if the Court were to consider the substance of MAL's alter ego claim, the claim must still fail because the Individual Defendants are not the alter ego of 540 Auto.

The principle that shareholders, officers, and directors of a corporation are generally not liable for the debts of the corporation is "ingrained in Ohio law." *Dombrowski v. Wellpoint, Inc.*, 895 N.E.2d 538, 542 (Ohio 2008). Nevertheless, "in certain circumstances, the corporate form may be disregarded, and the corporate veil pierced, for the purposes of reaching the assets of the corporation's individual shareholders." *Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 616 (Ohio 2009). "When a shareholder misuses the corporate form as a shield from liability for their own misdeeds, Ohio law will permit

34

piercing of the corporate veil as a rare exception to the guiding principles of limited shareholder liability." *United States Bank Nat'l Assn. v. MMCO, L.L.C.*, 183 N.E.3d 499, 515 (Ohio Ct. App. 2021).

The Ohio Supreme Court has established a three-prong test to determine whether to pierce the corporate veil:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own,

> (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act [or a similarly unlawful act] against the person seeking to disregard the corporate entity, and

> (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1085-86 (Ohio 1993); *Dombrowski*, 895 N.E.2d at 545.

"The first prong of the *Belvedere* test is basically the 'alter ego' doctrine." *Byars v. Herman*, No. 83496, 2004 Ohio App. LEXIS 3276, at *10 (Ohio Ct. App. July 8, 2003). When determining whether an "individual and corporation are indistinguishable" for purposes of the first prong, courts consider factors such as: (1) whether the corporation has grossly inadequate capitalization, (2) whether corporate formalities were observed, (3) whether the corporation was insolvent at the time the debt was incurred, (4) whether shareholders held themselves out as personally liable for certain corporate obligations, (5) whether corporate property was used for a personal purpose, (6) whether corporate funds were commingled with personal funds, and (7) whether corporate records were kept. *Id.*; *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. Sept. 30, 1991).

To support its request that this Court pierce the corporate veil, MAL cites the following facts: (1) Zoila Abukatab is the sole shareholder of 540 Auto, (2) Individual Defendants have interest in related entities that operate out of the same location as 540 Auto, and (3) 540 Auto's business pursuits changed throughout the parties' relationship. (MAL's Response in Opp. to Individual Defendants, Doc. 58, Pg. ID 2323.)

The facts presented by MAL do not meet the hefty first prong of the *Belvedere* test. First, that 540 Auto has one shareholder does not automatically mean that Individual Defendants and 540 Auto are one and the same. *See My Father's House #1, Inc. v. McCardle*, 986 N.E.2d 1081, 1089 (Ohio Ct. App. 2013) (citations omitted) ("It is well settled that a corporation is a separate legal entity from its shareholders, even when the corporation only has one shareholder.") Similarly, the fact that Individual Defendants have interest in related entities does not mean that the parties are indistinguishable. Nor does the fact that a business has changed its purpose mean that the corporation lacks a separate mind. These facts are not enough to show that 540 Auto and Individual Defendants are the same.

To be sure, many facts on the record show that Individual Defendants and 540 Auto are separate entities. First, 540 Auto has its own bank account. (Adbul Dep., Doc. 501, Pg. ID 1432; Abukatab Aff., Doc. 52-2, Pg. ID 1696.) Second, 540 Auto has its own facility for its operations (Abukatab Dep., Doc. 50-1, Pg. ID 1410), and no evidence suggests that the facility was used for personal matters. And though Abdul Abukatab engaged in correspondence on behalf of 540 Auto, he did so through a "540autogroup" email account. (*See, e.g.*, Email Correspondence, Doc. 49-7.) In sum, MAL has not

presented sufficient evidence to create an inference that 540 Auto had "no separate mind, will, or existence of its own." *Belvedere*, 617 N.E.2d at 1085-86. Thus, the first prong of the *Belvedere* test has not been met.

MAL has not shown that Individual Defendants are the alter ego of 540 Auto. Thus, summary judgment for Individual Defendants on this claim is appropriate.

### g. 540 Auto's Breach of Contract Claim Against MAL

The Court now turns its attention to 540 Auto's counterclaims against MAL. 540 Auto first brings a breach of contract claim against MAL. (Answer and Counterclaim, Doc. 2, ¶¶ 18-22.) MAL moves for summary judgment in its favor on this claim, arguing that 540 Auto has not shown a breach. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1980-81.) 540 Auto opposes this argument, citing to several acts by MAL that 540 Auto believes to be breaches. (540 Auto's Response in Opp., Doc. 56, Pg. ID 2245-47.)

Some instances provided by 540 Auto to show that MAL breached the Lease Agreement are baseless. First, 540 Auto argues that MAL breached the agreement by failing to accept payment to offset 540 Auto's default. (Answer and Counterclaim, Doc. 2, ¶ 20.) The only instance where this may have occurred is when MAL refused 540 Auto's funds that it had received from the unauthorized sale of Units 989302 and 990504. (Abukatab Dep., Doc. 50-1, Pg. ID 1467-68.) But, as discussed above, 540 Auto was not authorized to sell those vehicles. (*See* Notice of Default, Doc. 53-5; Lease Agreement, Doc. 7-1, Pg. ID 115.) In turn, MAL did not have to accept those funds. 540 Auto also argues that MAL breached the Lease Agreement when it sold the leased vehicles below fair market value. (Answer and Counterclaim, Doc. 2, ¶ 20.) The Lease Agreement provides

that MAL may repossess and sell the vehicles leased to 540 Auto to offset 540 Auto's debt—no provision requires 540 Auto to sell those vehicles at fair market value. (Lease Agreement, Doc. 7-1, Pg. ID 117.) Thus, these two actions by MAL do not constitute a breach of the Lease Agreement.

But, as discussed above, MAL may have breached the Lease Agreement in two instances. First, MAL may have breached the Lease Agreement when it refused to pay certain vehicle taxes. Though the Court found that this breach was not material to waive 540 Auto's performance, 540 Auto is not precluded from bringing it forward under a theory of breach of contract. *See Nious v. Griffin Constr., Inc.*, No. 03AP-980, 2004 Ohio App. LEXIS 3744, at *8 (Ohio Ct. App. Aug. 5, 2004) ("[T]he concept of 'material breach' is only relevant when a plaintiff stops performing because of a defendant's breach."). Additionally, MAL may have breached the Lease Agreement when it charged 540 Auto for Units 1009007, 1009008, and 1009009. Thus, summary judgment on this claim is not appropriate.

### h. 540 Auto's Breach of the Covenant of Good Faith and Fair Dealing Claim Against MAL

Next, the Court considers 540 Auto's claim against MAL for breach of the covenant of good faith and fair dealing. (Answer and Counterclaim, Doc. 2, ¶¶ 23-26.) MAL moves for summary judgment on this claim, solely arguing that MAL was not responsible for 540 Auto's vehicle taxes. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1980-81.) But, as discussed, there is a question of fact related to this issue. MAL has not brought any other arguments forward to contest this claim. Thus, MAL has not met its burden

and summary judgment must be denied on this issue.

     **i.  540 Auto's Declaratory Judgment Claim Against MAL**

Finally, the Court will consider 540 Auto's claim for declaratory judgment. (Answer and Counterclaim, Doc. 2, ¶¶ 27-29.) MAL moves for summary judgment on this claim, again solely arguing that MAL was no responsible for 540 Auto's vehicle taxes. (MAL's Motion for Summary Judgment, Doc. 55, Pg. ID 1980-81.) But, as discussed, MAL has not shown that it is not responsible for the vehicle taxes. Thus, MAL has not met its burden to grant summary judgment on this claim.

## CONCLUSION

Based on the foregoing, the Court **ORDERS** the following:

1. Defendants' Motion for Leave to Amend their Answer to the Amended Complaint (Doc. 46) is **DENIED**;

2. Defendant 540 Auto Repair Inc.'s Motion for Summary Judgment on the Amended Complaint (Doc. 51) is **GRANTED IN PART AND DENIED IN PART**;

3. Defendants Abdul and Zoila Abukatab's Motion for Summary Judgment on the Amended Complaint (Doc. 52) is **GRANTED IN PART AND DENIED IN PART**;

4. Plaintiff Mike Albert, Ltd.'s Motion for Partial Summary Judgment (Doc. 55) is **DENIED**;

5. Summary Judgment on Mike Albert, Ltd.'s Breach of Contract claim against 540 Auto Repair Inc. is **DENIED**;

6. Summary Judgment on Mike Albert, Ltd.'s Action on Account claim against 540 Auto Repair Inc. is **DENIED**;

7. Summary Judgment on Mike Albert, Ltd.'s Unjust Enrichment claim against all Defendants is **ENTERED** in favor of Defendants;

8. Summary Judgment on Mike Albert, Ltd.'s Conversion claim against all Defendants is **DENIED**;

9. Summary Judgment on Mike Albert, Ltd.'s Fraudulent Inducement claim against all Defendants is **ENTERED** in favor of Defendants;

10. Summary Judgment on Mike Albert, Ltd.'s Alter Ego claim against Abdul and Zoila Abukatab is **ENTERED** in favor of Abdul and Zoila Abukatab;

11. Summary Judgment on 540 Auto Repair Inc.'s Breach of Contract claim against Mike Albert, Ltd. is **DENIED**;

12. Summary Judgment on 540 Auto Repair Inc.'s Breach of the Covenant of Good Faith and Fair Dealing against Mike Albert, Ltd. is **DENIED**; and

13. Summary Judgment on 540 Auto Repair Inc.'s Declaratory Judgment claim against Mike Albert, Ltd. is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND